In Re. Gesture Technology Partners, 2025-1075 We're ready when you are, Counsel. May it please the Court, John Wittenzellner on behalf of Gesture Technology Partners. I think the panel's question earlier about whether there are any more GTP proceedings lingering is very pertinent to this appeal. This is actually the third appeal pertaining to the 431 patent. But aside from this, are there yet more gesture patents being reviewed at the PTO? I believe my counterpart was correct. If the panel agrees with us on this appeal, this one may go back for determination on the establishment. But that's it? That's the end of the line after these two cases? None that I'm aware of. So this is actually the third appeal up. The 431 patent has survived two IPRs that were affirmed by this Court. And the two issues to be decided today are, the first one is, frankly, whether this appeal should be here. Because the Patent Office did not properly evaluate the estoppel provision of 35 U.S.C. 315e1. And second, whether the Lieberman reference anticipates claims in 11. And this is different from the previous proceeding that was argued, because there is only an anticipation around no single reference obviousness ground. Well, the estoppel provision, 317e1, relates to a petitioner, not the office. It does, but it's... Estoppel runs against the petitioner. Correct, Your Honor. The petitioner here is Samsung. And Samsung filed the ex parte re-exam and is a real party in interest or privy to unified patents, which filed one of the earlier IPRs. And this isn't just speculation. Under this Court's rulings in RPX, Corporation versus Applications in Internet Time, as well as the Patent Office itself actually previously finding that unified patents is a real party in interest with its members, such as Samsung. Okay, but that issue of whether unified patents really has to be treated as a privy doesn't directly affect the argument you're making now, as I understand it, which is the principal argument, and that is that the Patent Office may not continue the re-examination under the circumstances in which a petitioner would not be permitted to institute or to request a re-examination. That's 100 percent correct, Your Honor. Why isn't that true in light of, as Judge Ruri points out, the language of the statute is petitioner, not it may not be brought or maintained. I raise those issues only or raise those facts only because they were not addressed by the Patent Office. No, I understand. We don't get to that if we find that the Patent Office can maintain it willy-nilly regardless of whether the petitioner is barred once it's been instituted. So, correct. The Director did not have to address those facts because of the Patent Office's interpretation of maintain. And why isn't their interpretation reasonable in light of the language of the statute? There's several reasons, Your Honor. I think first we start with the language of the statute itself. The statute was written. The parties agree that the term proceeding as used in the statute refers to both inter partes review and ex parte re-examination. Within the statute itself, it starts with the petitioner in an inter partes review and then later talks about which uses the term proceedings to refer to what will be stopped. The statute could have been drafted to have this carve out the Patent Office seeks, but it was not drafted that way. And that's consistent with the Congressional record. My counterparts point to the Congressional record in several instances, but again, there's no discussion of a carve out for ex parte re-examination. To the contrary, the authors... The statute doesn't say the agency may not maintain a proceeding before the office, right? It does not. So, because this is an ex parte re-examination, I mean, just by definition, that requester doesn't have any role during the course of the proceeding. After the reply. After... Once the reply, he's done. Was there a patent owner's statement filed by you in this case? No. Okay. So there wasn't a reply to the patent owner's statement. So after the re-exam request was filed, this requester did not have any role or participation in this proceeding. The requester did not, but that's not to say that under the patent office's rules, requesters still can be... Submit statements. They just may not be considered. I think we covered some of the MPE... Right. That's the regulation. They could try to submit something for the agency's consideration, but the regulation makes it very clear it'll be ignored. Your Honor, I also... One of our other bases here is the court's own decision in Unilog versus Facebook. Where the court interpreted the word maintains in the statute to apply to not only the initial filing or proceeding, but all stages of the proceeding. I think that's important here again where... That Unilog case, that's an IPR, right? It is.  But again, whether we're looking at the statute itself or this court's opinions, I think there's a careful choice of language where it was written towards proceedings rather than being limited to inter partes review or carving out ex parte reexamination as the patent office seeks to do. Well, but if we're looking closely at language, it seems to me that it's pretty clear if you read E1, starts out the petitioner and then it defines the nature of the petitioner and so forth, and then you pick up with may not request or maintain. So, I don't know how you get from that language to saying that the board, not the board, the PTO may not maintain. I mean, as I understand the process, anyone can come in and ask for an ex parte reexamination and once they've made the request with a reply, they drop out. The rest of it is carried by the PTO. And if that's true, I don't know why the petitioner may not request or maintain a proceeding tells the office what it may or may not do. That's my biggest problem with your argument. Your Honor, that actually keys into one of the points that I wanted to raise with the is that when the AIA was being considered, the authors of the minority report, and we raised this in our briefing, stated, quote, we also called for limiting use of ex parte reexamination to patent owners, noting that allowing three different avenues for administrative attack on patents invites serial challenges. And then, subsequently, the discussion of 315E and corresponding 325E for post-grant review states that those concerns were essentially taken care of by this stop-all provision as drafted. So, the party that uses inter partes or post-grant review is stopped from raising in a subsequent in the post-grant or inter partes review. And reading this in the context of, I think, the language in the statute, as well as the concerns addressed in the minority report, there's nothing in the language about, one, carving out ex parte reexam. Two, nothing about... One can question the importance of legislative history in general. A minority report? Well, so this... The minority report led to the stop-all provision in the AIA. And what's important to note is that they are not discussing any carve out. And they are not also setting any boundary on the stop-all coming into effect with a final written decision. It's just simply someone that uses inter partes or post-grant review is stopped from raising it in a subsequent proceeding. There's no limitation on whether or not a final written decision has been issued to cut that off. I assume that if a fourth party were to come in and ask for reexamination, that you would argue that the board could not do a new reexamination, right? Depends on the relationship to the previous... If they were a... I assume they're not a... I say fourth party entirely unrelated to any of the parties that have been involved in the proceedings before. That's correct, Your Honor. If they have no relation, then they are neither the petitioner himself or a privy or real party interest. Also with my remaining... Unless there are any further questions from the panel, I'd like to address the prior art and the anticipation ground in view of Lieberman. Really two limitations, limitations C and D, which are both means plus function limitations that relate to what processing has to occur in the device. And these are in Claim 1, or I'm sorry, Claim 7. Claim 7, C and D. Claim 7. Yes, Your Honor. I apologize for misspeaking. And I stress the word anticipates because the board's findings read more akin to obviousness. The board's findings hinge on these so-called identifiers. Before you get there, just a real quick question. The board majority in dissent characterized the structure in a certain way, and it's consistent between the two of them. Where in the patent specification is that structure described? Because I saw their characterizations, but I couldn't find anything in the patent that correlates, if I may use that word, directly to the characterization. And if you don't have it in front of you, you can get it for rebuttal. This is just for my, to help me with this issue. But go ahead.  Right. So I think the big issue is these so-called identifiers. In the briefing, my counterparts skipped the plural on identifiers and just call it an identifier or a unique identifier, and that's not the case. When we actually look at what Lieberman discloses, and this is Column 4, Lines 64 through 66, Column 6, Lines 49 through 51, it simply describes the identifiers as being formed of a process, really all it says is the image captured by the camera is transformed into manageable identifiers. And then Column 4. What was that first reference? I'm sorry. Certainly, Your Honor, it's Column 4, starting at Line 64.  So the images are captured by the camera, and they're processed to form these identifiers. Lieberman doesn't really tell us what these identifiers are. Continuing at the bottom of Column 4, it says the identifiers are in the form of tables of numbers. And in the scope of computing, that really tells us nothing. Everything inside of a computer are numbers. All the data is numbers. Binary numbers, images are arrays of numbers, even text are numerical codes,  So it's really telling us nothing about what they actually are. Do you disagree that the identifiers are basically shorthand representations of the image that's been captured? The spec does talk about how an image, a captured image, is collapsed into these identifiers. They are certainly generated based on the image. With this limited disclosure, the closest concept I have... But the whole point is, you send these identifiers over to a center, and then the center is going to do a translation of the identifiers into words. Into signing gestures. But when you read what's being sent over and why this is done, it's because at the time there was limited bandwidth. They couldn't just send full video as we would do today, or have the capability to do today. I read it as akin to compression, because they didn't have the capability to send full video over telephone. This patent says it's not compression, right? It's this other thing called RDS, reduced data set. That's Column 12. I think it's still expressed compression. It says in the present invention, the preferred approach is to avoid the conventional approach of trying to force some compression scheme on the data, and instead bring the data down from the frame level to a reduced data set, RDS. So it's taking the fingerspelling captured by the camera, and then undergoing an RDS process, which I assume could only be referencing collapsing the image down to the identifiers. Potentially. I think there again you're using reduced data set, which just means you're losing some form of information that doesn't really tell you what the output is or how it's calculated. But the output is intended, I take it. You may disagree, but I see what you do. I think that the idea of the RDS is intended to capture a single gesture. That is what an identifier, as I understood the concept, was intended to embrace, and that identifiers would be sent gesture by gesture. I don't believe that's the case, Your Honor. I think that's what my counterparts argued in the brief, but when you actually look at first the reference and then even the Board's decision itself, what would be a gesture or signing gesture is actually signed multiple identifiers. So there's no unique identifier where the phone sees a gesture and then says, well, this is gesture seven, signing gesture seven. It's generating multiple identifiers. But is it not the case that the identifiers, the limitation on whether it's a single or multiple identifiers is established in the handheld device according to the beginning and end of a particular gesture? I believe it's there are multiple identifiers per gesture.  But once you get to the end of a sequence of identifiers, which is defined by the end of a gesture, then you've got a block of identifiers. So the identifiers are picking up on the beginning and the end of a gesture and if the gesture is complex, there may be more identifiers. If it's simple, fewer. Correct? I read it more as not necessarily the end of a gesture, but the end of motion. And so the device is not sending, which is different because if it's the end of motion, you could actually have multiple gestures in this block of identifiers. Okay. But in any event, however it chops up the data, the gestures or the motions are intended to be and are determined to be. There is a determination of when something begins and when it ends, and by that determination a block of information is then identified, which is sent downstream. Is that a fair characterization? I do not know that I would characterize it as the block of data being and then shipped off as one. Okay. Maybe they get sent off as things develop. But nonetheless, the whole idea that I understood behind the patent is that these identifiers would either singly or in multiple form identify a particular segment of action. And if the segment of action was short, maybe only a couple of identifiers or maybe only one if it was longer, more. Is that fair? I believe so. It's shorthanding the motion that the camera's captured, but I think we need to be critical that the device itself is not actually doing any analysis or correlation of what those gestures actually correspond to, and they are identified. But the machine is determining when there's a beginning and when there's an end. Of motion. Of the motion or the gesture or whatever.  Okay. Counsel, it may be an unwelcome gesture, but I have to tell you that your time has expired. We'll give you two minutes for rebuttal. It's here from the Patent Office. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. There are only two issues this Court needs to address to resolve this case. The first is whether the USPTO's interpretation of Section 315E1 is reasonable. The second is whether Lieberman discloses the means for controlling a function. Can you help me with respect to my question that I put to your opposing counsel? Where in the patent itself is the structure that corresponds to the means to the function? Where is that found in the specification? The problem I have is that both the majority and the dissent for the board characterized the structure in a fairly detailed way, and I went looking for that language in the patent, and I didn't find it. So I'm wondering where they got that, and where is it in the patent, either in hyc verba or in substance? The patent does not expressly disclose a computer means, but gesture has never disputed that the transmitter-receiver aid includes a computer means. That is not in dispute. There's never been dispute that some sort of computer processing takes place in transmitter-receiver, in Lieberman's transmitter-receiver. So that has never been a dispute. And the board found that it necessarily is there because this process that you see outlined in Figure 1, all of that processing takes place, and that requires a computer means. Okay. But I have a much more mundane issue that I'm trying to extract here from Castle. For example, in Judge Dugald's opinion, he says, the corresponding structure is a handheld computer apparatus programmed with an algorithm to cause the handheld computer to receive position information, correlate the position information, and cause the handheld apparatus to perform the function. And my question is, that's fine if that's the structure, but where is it in the patent? Your Honor, the board didn't make — Did they make it up? They didn't. They made a finding that it necessarily is there because you would need a computer to do all the things shown in that first column of Figure 1. You understand what my concern is really, basically, very simple. It's just I don't see this language or its equivalent anywhere in the patent, but maybe I missed it. Did I miss it? You are correct. The patent doesn't say, oh, we have a computer or software in the transmitter-receiver that does this. It, to my knowledge, Lieberman doesn't state that. However, the board found and the examiner found that it's necessarily there, that computer beings must be there to convert these images to identifiers. But this is not Lieberman. This is in the patent suit. We're trying to figure out the corresponding structure for the means for controlling limitation, and obviously, it's the patent specification of the 431. Oh, I'm sorry. That has to disclose the corresponding structure, and then the question is where, if anywhere, is this specification? If there's no corresponding structure, then the claim is invalid. Yeah, and then where, is there a passage in the specification that says, here is the interesting algorithm. You receive position information. Then you correlate that position information with a function, and then you cause the apparatus to perform the function. Thank you. There's probably nothing in the spec that says it like that, right? To my knowledge, I don't recall the specification ever saying, here's the software, here's the computer means that does that. My apologies to both your honors, and thank you for the clarification. No, I think Judge Chen put the question much better than I did, so. No, no, I thought, and in fairness to my friend across the aisle, I think my friend thought we were talking about Lieberman. No, I was not. The specification provides no more information about how the processing takes place than Lieberman provides. The way I read the board opinion here is the origins of this claim construction for the corresponding structure really comes from a different proceeding, from a prior IPR of this patent, where the petitioner in that IPR proposed this construction for, I guess, a very similar limitation means for controlling, and there was no resistance from the patent owner in that proceeding, and so then the board just proceeded to adopt that proposed construction, and then here in this re-exam, everybody just moved forward on the premise of, well, that construction must be fine. Certainly the patent owner doesn't resist it or didn't resist it before, so we'll just assume that this is the construction, and based on that construction that's undisputed, here's why Lieberman teaches all this. Yes, Your Honor, I think that's a fair characterization. This issue and this particular wording had already, the means for controlling the function had already been, and computer means had already both been, those terms had both been construed in prior proceedings, and gesture appeared to, from those proceedings, agree with those constructions, and so the board took the path of least resistance and agreed to adopt gesture constructions of those terms, and Lieberman, if we're going on the goose-gander principle, Lieberman discloses as much about how those processes take place as the specification, and so I think I've answered those questions. I would like to respond to what my friend appears to be doing, which is re-raising this issue about whether the identifiers are information concerning positions or movements or gestures. They've already lost on this point. This court has already determined, and we cite the case at page 47 of our red brief. This court has already determined that the identifiers, or an identifier or set of identifiers, are information corresponding to a gesture, the position, the movement, and that I think your honors fully understand the board's position that unlike gesture's argument that, and what the dissent believes, every image is not converted into, there isn't a steady stream of images coming in from the camera that are being converted to identifiers and continually sent to the central processor in Lieberman. Whatever computer means and whatever software is on board Lieberman's transmitter receiver, it is saying, here's the beginning and end of a gesture, we'll convert that to an identifier, set of identifiers, and then we'll transmit that. And that, in the board, in the majority's view, and in the examiner's view, is a function, and it controls indirectly that function of transmitting, which is one of the functions that gesture agreed is encompassed by, and inherently claim 13, the claim on appeal. So to translate this into lay language, you would say that I think I understand what you're saying, and it was my understanding of how this works. Correct me if I'm wrong. This is not simply a case of the handheld simply passing along a whole series of bits without discrimination, just all the way down to the main processor, but rather that the handheld is making determinations as to when something is beginning and something is ending, whether we call it a gesture or a motion or a signal. It's making that determination and sending those packages, that package or those packages, downstream accordingly, and that's where you get the correlation, I take it. Yes. Is that accurate? Yes. And the board, if you look at the board's decision at A24, the board discusses how that controls the function. So if I take this image and I convert it to this identifier, a set of identifiers that are unique to that, whatever those gestures were, then the device says, okay, we're going to send this set of unique identifiers. And then if another gesture comes in, that's converted to another unique identifier or set of identifiers, and, okay, we're going to transmit that. So the handheld has to know or discern when a gesture or motion has started and when it's stopped. It makes that determination without assistance from the central processor. Right. And if you look at Figure 1, and we reproduced this in our brief, if you look at Figure 1 of Lieberman, you can very clearly see the things that are in the column that the transmitter-receiver does, and that the turning computer gesture start and end is very clearly in that column. And it's only once the identifiers are generated, and then those move over to the next column, where we have the functions of the central processor in Lieberman. The specification in Lieberman also talks about how there are images captured at 20 to 30 frames per second, and then it goes on to say that each frame is perhaps translated into an identifier. Is that correct? I think... How would you best describe what's going on there and how it then reconciles with what you and Judge Bryson were just talking about? I believe that Lieberman, and this is the way the board interpreted Lieberman, Lieberman's teachings, that that may have been an overly broad statement by Lieberman. The camera may be capturing that many images per second, but some software in the transmitter-receiver decides which images are not going anywhere. For example, I don't think there's any dispute, or there shouldn't be any dispute, that if the user is just standing there and not moving, that all those images are not converted to identifiers and then transmitted over to the central processor. And I think figure one makes that very clear. Did the board... I didn't see the board ever try to explain what the word correlate means, because that term is used in the claim construction for means for controlling. It's true in the claim construction. Exactly, that correlating the position information with a function. What does that actually require? What's your conception of what is needed when it comes to correlating the information with a function? Well, the board found that correlate, if you look at the appendix at page 10, the board found that correlate means to bring into mutual or reciprocal relation. And so the board... Establishing an orderly connection, or an inorderly connection. Right. Okay. A reciprocal relation. So correlate is... Could it mean nothing more than associating position information with a function? Oh, I have an identifier that needs to be transmitted. I'm going to now cause the transmission. Well, correlation takes place at two different points, and I think that's how the board really saw that happen. This gesture correlates to this identifier, and then we're going to send that identifier that correlates to the image to then the central processor. So whether you're looking at one of those steps or the other, the correlation limitation is met. What do you think it means for a party, perhaps a re-exam requester, an IPR petitioner, to maintain a proceeding? In other words, in a single sentence, how would you define maintain a proceeding? How does a party maintain a proceeding? A party maintains a proceeding by not filing a petition to terminate. Okay, but is the re-exam requester then maintaining a proceeding by not filing a petition to terminate? Well, if we're talking about a petitioner, I'm sorry, Your Honor, petitioner is what is the party in an IPR. I perhaps was being a little too pedantic. The requester in a re-exam, the requester in a re-exam plays no role in a re-exam, so they're never maintaining anything in an ex parte re-exam before the USPTO. If you look at the statute, 35 U.S.C. section 305, the language there is very clear that the re-exam actually begins, I mean, you have an order, the patent owner may file an opposition, and the order issues once the examiner finds that there's a substantial question of patentability raised by the request. Then the patent owner has an opportunity to oppose that, to file a response to the examiner's determination. I guess what I'm wondering is in some ways the agency is maintaining a proceeding, whether that proceeding is an ex parte re-examination or an inter-parties review before the board. It's the agency that's maintaining the proceeding. Even an IPR petitioner is not necessarily maintaining an IPR proceeding because the IPR petitioner doesn't have any right to just terminate the proceeding, perhaps like a plaintiff in a district court proceeding by dismissing the case. It's ultimately up to the agency to decide whether to maintain a proceeding, even in the face of a motion to terminate by an IPR petitioner. So in that way, a petitioner is not maintaining a proceeding. So I'm just trying to understand what are the qualities that make it so that we could determine whether a party is actually maintaining a proceeding. If I understand Your Honor correctly, you're referring to the tension between what we're saying here with respect to ex parte re-exams and say the board's ability, the office's ability to maintain an IPR or PTR under 315D or 325D. And what we're saying here is that in ex parte re-examination, we are the party maintaining as well, and that there's a little bit of a tension there. And we agree that there is a tension there, but importantly... What's the tension? The tension, as you said, is that even really in an IPR or a PGR, if the patent owner or the petitioner filed a petition to terminate, the PTL may continue, the agency may continue to maintain the IPR or the PTR after that. And I would say before that point, the petitioner and the patent owner were maintaining, and then it moved forward to the director's option. But in an ex parte re-exam, the PTO was always maintaining. And the statute makes clear that in Section 305, that re-exam begins after the petitioner, sorry, the requester no longer has a role, no longer has the opportunity to be heard at all. And importantly, the ex parte re-examination statute existed for several decades before any of these AIA proceedings came on board. And the director, by statute, has the authority to institute an ex parte re-exam on its own initiative. And that is something not available with IPR or PGR. So there are meaningful differences between those sorts of statutes. But we don't even have to get into all the stuff about maintaining necessarily, because 315 applies to petitioners, parties in privity, and real parties of interest. It doesn't say the office may not maintain. Whereas if you look at the statute 315D and 325D, what those say is when the office is done in the IPR or PGR, I'm sorry, when the petitioner is done in the IPR or PGR, the director still has the authority to go ahead and keep it going, to maintain. Thank you, counsel. Does that respond?  Thank you very much, Ms. Kelly. Mr. Wittenzelder has a couple of minutes for rebuttal. Thank you, Your Honor. I appreciate the additional time. I wanted to start by answering Judge Bryson's question. There's an identification by the board of the corresponding structure, for that means post-function limitation, appendix 731. There's a list of several portions within the specification, but just for quick discussion, there's one example is column 12, lines 46 through 52, and it's talking about computer 830, and it's discussing part of the algorithm being that it is subtracting successive images from each other. This image subtraction is a way of detecting motion in video. Take one frame, subtract it from the other, and the difference tells you what motion occurred. Onto the second point is with regard to whether the identifiers are actually correlated to any function. I believe that Judge Dugal, the PTAP, is correct that there is no correlation. Regardless of the motion, any identifier or identifiers generated by the handheld device will cause the same function to operate. There is no correlation between those identifiers and the transmission function. It's simply whether or not there is motion, any motion, and it could actually be motion that is not a gesture. For example, if the user sways or there's a change in the background, that will also generate an identifier. How do we know that? Because it's just talking about motion, and so that's sent off. Even within the context of gestures, if the identifiers are only happening through the generation of identifiers, again, there's no correlation. Literally any gesture will cause the same transmission function to be performed. Then the third point is that, I believe my counterpart brought it up, but I just wanted to confirm, the Patent Office does, in fact, in some instances, maintain IPRs itself, even when the petitioner chooses to withdraw based on the timing of the proceeding. There are instances of that as well. Unless the panel has any further questions, I have nothing. Thank you, counsel. The case is submitted, and that concludes today's audience.